**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTY ALIPOSA,

                Plaintiff,

v.

RUSH UNIVERSITY MEDICAL CENTER,

                Defendant.

Case No. _____

**PLAINTIFF'S COMPLAINT**

**PLAINTIFF, CHRISTY ALIPOSA**, through her attorneys Jaz Park and Richard J. Gonzalez of the Law Offices of Chicago-Kent College of Law, complains against **DEFENDANT, RUSH UNIVERSITY MEDICAL CENTER ("Rush" or "RUMC")**, as follows:

**NATURE OF THE ACTION**

1. This is an action for damages related to Plaintiff's employment with RUSH UNIVERSITY MEDICAL CENTER to redress DEFENDANT's violation of PLAINTIFF's rights as guaranteed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et. seq., and the Civil Rights Act of 1866, 42 U.S.C. §1981.

**JURISDICTION AND VENUE**

2. This court has jurisdiction of this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et. seq.*, the Civil Rights Act of 1866, 42 U.S.C. §1981, and 28 U.S.C. §1331 and 28 U.S.C. § 1367.

3. Venue is proper pursuant to 28 U.S.C. §1391 because the claim arose in this judicial district.

4. PLAINTIFF has met all administrative prerequisites to suit in that she timely filed charges of discrimination, no. 440-2020-04719, against Defendant with the EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC") on May 20, 2020, received a "Right To Sue Letter" on March 16, 2021 (**Exhibit A**) and brings this action within the limitations periods of 42 U.S.C. § 2000(e) *et. seq*.

## PARTIES

5. At the time of her termination, PLAINTIFF worked for DEFENDANT as a full-time Nurse Manager.

6. PLAINTIFF was terminated by DEFENDANT on March 3, 2020.

7. DEFENDANT is a hospital located within the state of Illinois at 1620 West Harrison Street in Chicago, Illinois.

8. DEFENDANT is a "covered employer" within the definition of Title VII.

## FACTS

9. **PLAINTIFF, CHRISTY ALIPOSA,** BSN, RN, CMSRN, was a long-term and highly-rated employee, holding titles including Magnet Nurse of the Year for 2016.

10. PLAINTIFF is an Asian-American female.

11. PLAINTIFF is a member of a protected class within the definition of Title VII.

12. PLAINTIFF began working for DEFENDANT in September 1999.

13. PLAINTIFF received positive performance reviews throughout her employment with Defendant, and received other awards, including Employee of the Month, Department of Medical-Surgical Nursing for two months.

14. Plaintiff demonstrated a history of nurse leadership, reflected in her participation in the Professional Nursing Staff (PNS), and serving as President, in 2015.

15. In her participation in PNS, she served as a representative of all nurses at Rush University Medical Center, to improve nursing practice through the shared governance structure and the Nurse Managers' Committee.

16. In these activities, she was dedicated to the promotion of excellence in professional performance among the nursing staff.

17. PLAINTIFF dedicated her efforts to the community as well. She organized ten health fairs for Thresholds, a nonprofit organization servicing individuals with mental illness and substance abuse issues.

18. In 2017, PLAINTIFF began reporting to Mr. David Smart, currently interim DOIM Administrator.

19. In the nineteen (19) years prior to Smart's tenure, PLAINTIFF did not receive any negative performance reviews.

20. DEFENDANT often commended PLAINTIFF in performance reviews for her collaborative and positive nature.

21. Smart offered PLAINTIFF less workplace guidance and support than her previous supervisors.

22. In July 2019, DEFENDANT issued PLAINTIFF a Level 2 disciplinary notice for three incidents at work, despite never having any previous disciplinary issues.

23. The three incidents listed in the July 2019 disciplinary notice were minor issues.

24. The DEFENDANT did not offer any recommendations for improvement in the July 2019 disciplinary notice.

25. Rush HR Policy E-03.00 states "Before any discipline is administered, the manager should meet with the employee to discuss the concern and to hear the employee's perspective on the issue. Thereafter, the manager should consider all facts and evidence before making a decision on disciplinary action."

26. Neither DEFENDANT nor Smart ever directly addressed the three incidents with PLAINTIFF prior to issuing the disciplinary notice.

27. PLAINTIFF disputed the notice. As a result, the appeals panel removed one incident altogether, and reduced the general status level of the disciplinary notice from Level 2 to Level 1.

28. The March 3, 2020 termination letter fails to mention the Level 2 disciplinary notice as a factor that influenced DEFENDANT's decision to terminate PLAINTIFF.

29. However, DEFENDANT's EEOC Position Statement does reference the Level 2 disciplinary notice as a factor that influenced DEFENDANT's decision to terminate PLAINTIFF.

30. For Fiscal Year 2020, Smart embedded management training into PLAINTIFF's performance goals.

31. Previously, PLAINTIFF had never been required to complete management training as part of her annual performance goals.

32. On February 13, 2020, PLAINTIFF requested to enroll in the management training. On February 14, 2020, DEFENDANT's Leadership Academy informed both Smart and PLAINTIFF that PLAINTIFF was not eligible to enroll because she was not a new hire.

33. PLAINTIFF repeatedly expressed her need to enroll as assigned by Smart as performance goals, but the Leadership Academy continued to deny her request. The Leadership Academy also informed Smart that PLAINTIFF was ineligible.

34. On February 14, 2020, PLAINTIFF spoke with Jeff Kelleher, Organizational Effectiveness Specialist, who informed her that management trainings are not to be considered performance goals—even though Smart had classified management trainings as such.

35. On February 17, 2020, Jeff Kelleher emailed PLAINTIFF again, indicating that Smart had essentially conducted PLAINTIFF's performance evaluation incorrectly.

36. In the February 17, 2020 email, Kelleher informed PLAINTIFF that she "should not be penalized in your final performance rating for items that cannot be completed . . . especially those out of your control." Kelleher also noted that her manager had also "adjusted her engagement goal."

37. As a result, PLAINTIFF spoke with HR, who directed her to contact Dr. Richa Gupta, RUMC Senior Vice President and Chief Operating Officer, and Smart's supervisor, Dr. Jochen Reiser, RUMC Chairman of Medicine, to express her concerns. On February 20, 2020, PLAINTIFF emailed Drs. Gupta and Reiser, and enclosed Kelleher's feedback and comments.

38. On Thursday, February 27, 2020, PLAINTIFF met with Dr. Jochen Reiser to express concerns regarding Smart's management, and to discuss the erroneous performance evaluation.

39. On the following Tuesday, March 3, 2020, PLAINTIFF received a termination letter from Smart.

40. The March 3, 2020 termination letter indicated PLAINTIFF was being fired for "safety concerns."

41. The March 3, 2020 termination letter alleges that on December 13, 2019, PLAINTIFF "incorrectly administered a Tdap vaccine to a patient."

42. In fact on December 13, 2019, PLAINTIFF administered Tdap to a patient whose chart recommended the Td vaccine.

43. The DEFENDANT, in its EEOC Position Statement, submitted for the purpose of investigation at the EEOC, categorized this incident as a "medication error" that "endangered the safety of a patient."

44. However, by October 19, 2019, the Center for Disease Control ("CDC") had already recognized that Tdap and Td vaccines were essentially interchangeable for patients over the age of 7.

45. Furthermore, current CDC guidance recognizes the interchangeability of Tdap and Td for patients aged 19 or older.

46. Because the CDC recognizes Tdap and Td as interchangeable, the administration of Tdap rather than Td is not considered a safety concern or medical error.

47. In the March 3, 2020 termination letter and DEFENDANT'S EEOC Position Statement, Smart and DEFENDANT misrepresented the gravity of the vaccine incident.

48. The March 3, 2020 termination letter also alleges PLAINTIFF lacked the authority to administer the vaccine.

49. PLAINTIFF'S job title and responsibilities included possessing the authority to administer vaccines to patients.

6

50. The March 3, 2020 termination letter alleges PLAINTIFF informed Smart "approximately two weeks after it occurred."

51. In fact, PLAINTIFF informed Smart through an online submission portal on December 18, 2019—within days of the incident.

52. Furthermore, PLAINTIFF and Smart discussed the vaccine incident in a meeting on December 23, 2019—less than two weeks after the incident occurred.

53. However, DEFENDANT'S EEOC Position Statement alleges that DEFENDANT did not receive PLAINTIFF'S online submission, also called a "Safety Event," until December 24, 2019, 11 days after the incident occurred,

54. In the March 3, 2020 termination letter, Smart misrepresented the details surrounding the timeliness of the reporting. PLAINTIFF informed Smart of the issue well before two (2) weeks had passed.

55. The March 3, 2020 termination letter alleges that Smart assigned PLAINTIFF the task of creating a "process flow chart" outlining the alleged vaccine error, and two additional vaccine errors which did not involve the PLAINTIFF. The letter alleges Smart provided PLAINTIFF a two-week deadline to complete this project.

56. Smart assigned this project in addition to PLAINTIFF'S normally required duties.

57. In fact, Smart initially assigned PLAINTIFF to address only the December 13, 2019 incident. This information is reflected in the December 23, 2019 meeting notes.

58. After the December 23, 2019 meeting, Smart tasked PLAINTIFF with conducting flow charts for two additional vaccine errors, from prior years, neither of which involved PLAINTIFF. This is reflected in PLAINTIFF'S December 30, 2019 meeting notes.

7

59. One of the vaccine errors assigned by Smart had occurred two years prior by other employees.

60. That the event occurred two years prior, and that PLAINTIFF was not involved in the incident, created great difficulty for PLAINTIFF in gathering information for the flow chart.

61. In addition, PLAINTIFF had already scheduled three weeks of paid time off ("PTO") to commence prior to the project deadline.

62. As her supervisor, Smart was aware of PLAINTIFF's upcoming PTO, but assigned her the project and deadline anyway.

63. Creating "process flow charts" falls outside of PLAINTIFFs normally required duties.

64. Smart alleged he created these flow chart requirements as a part of a new policy he implemented.

65. This policy was not implemented prior to Smart's tenure.

66. Smart did not previously communicate this policy to PLAINTIFF or to other employees.

67. Smart did not require the other employees who had committed the previous vaccine errors to conduct this extra type of work or project of creating "process flow charts," in addition to their normal duties.

68. PLAINTIFF lacked the knowledge and abilities to conduct this type of "process flow chart" work.

69. Smart assigned PLAINTIFF the "process flow chart" work despite his awareness that the work was outside of her job title, function and capabilities in both knowledge and time frame.

8

70. The March 3, 2020 termination letter reprimands PLAINTIFF for work that she should not have been responsible for, either basis of knowledge, or for completion timeframes.

71. The letter referenced another incident that occurred around April 2019, in the context of an audit that was being conducted by the Illinois Department of Public Health ("IDPH"), on an organization-wide basis at the time, the "CMS audit."

72. At no time was PLAINTIFF previously penalized for these events, nor was she notified that she was subject to discipline as a result of these events.

73. PLAINTIFF'S July 2019 disciplinary notice fails to mention these April 2019 events.

74. PLAINTIFF's September 2019 annual performance review fails to mention these April 2019 events.

75. Since PLAINTIFF'S termination on March 3, 2020, DEFENDANT has significantly altered its explanations for terminating PLAINTIFF'S employment.

76. Various adverse actions taken against PLAINTIFF by DEFENDANT reflected negative race and gender biases against Asian American women.

**COUNT I – SEX DISCRIMINATION –DISCIPLINE AND TERMINATION**

77. Plaintiff repeats and re-alleges Paragraphs 9-76 above as though fully set forth herein.

78. During PLAINTIFF'S employment with DEFENDANT, she was treated differently than male and/or non-Asian employees who were in similar positions in that she did not receive the same treatment in performance evaluations as male employees.

79. PLAINTIFF's termination occurred under circumstances that raise a reasonable interference of unlawful discrimination and DEFENDANT's proffered reasons for terminating PLAINTIFF were pretextual.

80. By the conduct described above, DEFENDANT and its agents discriminated against PLAINTIFF in the term, conditions, and discharge of her employment because of her race and/or sex.

81. DEFENDANT acted in violation of Title VII of the Civil Rights Act of 1964, and the Civil Rights Act of 1866, 42 U.S.C. §1981.

82. As a result of DEFENDANT'S acts, PLAINTIFF has suffered loss of employment, wages, benefits, and other compensation.

**COUNT II – RACE DISCRIMINATION--DISCIPLINE AND TERMINATION**

83. PLAINTIFF repeats and re-alleges Paragraphs 9-76 above as though fully set forth herein.

84. During PLAINTIFF'S employment with DEFENDANT, she was treated differently than non-Asian and/or male employees who were in similar positions in that she did not receive the same treatment in performance evaluations as non-Asian and/or male employees.

85. PLAINTIFF's termination occurred under circumstances that raise a reasonable interference of unlawful discrimination and DEFENDANT's proffered reasons for terminating PLAINTIFF were pretextual.

86. By the conduct described above, DEFENDANT and its agents discriminated against PLAINTIFF in the term, conditions, and discharge of her employment because of her sex and/or race.

87. DEFENDANT acted in violation of Title VII of the Civil Rights Act of 1964, and the Civil Rights Act of 1866, 42 U.S.C. §1981.

88. As a result of DEFENDANT'S acts, PLAINTIFF has suffered loss of employment, wages, benefits, and other compensation.

## **COUNT III – RETALIATION**

89. PLAINTIFF repeats and re-alleges Paragraphs 9-76 above as though fully set forth herein.

90. PLAINTIFF engaged in a protected activity under Title VII of the Civil Rights Act of 1964.

91. PLAINTIFF reported Smart's discriminatory behavior—and his conduct regarding the erroneous performance evaluation—to management within the organization on February 27, 2020.

92. On March 3, 2020, Smart terminated PLAINTIFF.

93. Smart terminated PLAINTIFF just three business days after PLAINTIFF spoke with Smart's supervisors regarding his conduct and the erroneous performance review.

94. Smart's misrepresentations in PLAINTIFF'S termination letter serve as a pretext for retaliation against PLAINTIFF'S protected activity.

95. DEFENDANT acted in violation of Title VII of the Civil Rights Act of 1964, and the Civil Rights Act of 1866, 42 U.S.C. §1981.

96. As a result of DEFENDANT'S acts, PLAINTIFF has suffered loss of employment, wages, benefits, and other compensation.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

>Respectfully submitted,
>
>s:/Jaz Park_____
>JAZ PARK

JAZ PARK
Attorney at Law
6427 N Damen No 2E
Chicago, Illinois  60645
 (872) 588-0440
jaz.park@kentlaw.edu

RICHARD J. GONZALEZ
Chicago-Kent Law Offices
565 West Adams Street, Suite 600
Chicago, Illinois 60661
(312) 906-5079
rgonzale@kentlaw.iit.edu